UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-61004-CIV-DIMITROULEAS/SNOW

MICHAEL CUMINALE,

    Plaintiff,

vs.

ANDREW M. SAUL,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for disability benefits. The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq., and was referred to United States Magistrate Judge Lurana S. Snow for a Report and Recommendation.

## I. PROCEDURAL HISTORY

The Plaintiff filed an application for disability benefits on September 24, 2015, alleging disability since September 10, 2015, as a result of back pain and other ailments. The application was denied initially and upon reconsideration. The Plaintiff then requested a hearing, which was held before Administrative Law Judge James Andres on November 6, 2017. The Administrative Law Judge (ALJ) found that the Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council remanded the case to the ALJ for further proceedings. A second administrative hearing was held before Judge Andres on April 15, 2019, after which the ALJ again found that the Plaintiff was not disabled. The Appeals Council denied

the Plaintiff's request for review on March 24, 2020. The Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The Plaintiff was born on May 21, 1972, and has a high school education, followed by firefighting and EMT training. His past relevant work was as a firefighter. The Plaintiff injured his back in 1998 but was able to return to work. He injured his back again in May 2013 and stopped working in September 2015. (R:44, 97, 325)

The medical record reflects that following the Plaintiff's 2013 back injury he began treatment with Kenneth Jarolem, M.D., the orthopedist selected by Workers' Compensation to treat the Plaintiff. An MRI of the Plaintiff's lumbar spine performed on June 5, 2013, revealed the 1998 L4-5 and L5-S1 left hemisphere laminectomy and microdiscectomy. Changes were observed with decompression of the traversing L5 and S1 nerve roots, respectively; chronic spondylotic changes at L5-S1 with right greater than left foraminal narrowing and mild displacement of the right L5 nerve root. Also observed was L3-4 right foraminal/lateral protrusion with displacement of the right L3 nerve root. (R:99, 476)

On October 31, 2013, Dr. Jarolem noted that the Plaintiff had received two epidural injections, with no improvement. Physical examination revealed diffuse tenderness across the lumbosacral junction, with palpable spasm in the lumbar paraspinal musculature across the lumbosacral region. Straight leg raising reproduced low back pain. Dr. Jarolem informed the Plaintiff that he had multilevel disc pathology in the lumbar spine. The doctor explained that surgery would be of a large magnitude and a good result could not be guaranteed. The Plaintiff responded that the pain was so severe that he had no choice but to proceed with the surgery. Dr. Jarolem

then explained the discogram and multilevel lumbar decompression and fusion procedures. (R: 493-94)

On January 13, 2014, surgery targeting the Plaintiff's L3-L4 and L4-L5 disc spaces was performed by Naaman Abdullah, M.D. On May 23, 2014, Dr. Jarolem noted that the Plaintiff had made very good progress and was taking only Mobic for pain. He presented with a normal gait and mild tenderness across the lumbosacral junction. He was working 4 hours per day and requested that his schedule be increased to 6 hours per day, to which Dr. Jarolem agreed. (R:583-84, 636-37)

On August 27, 2014, the Plaintiff presented to Jerrold Young, M.D. at the Hernia Institute of Florida. The Plaintiff told Dr. Young that he had been left with a significant ileus with abdominal distension following his January surgery, and had developed an anterior hernia which was getting larger and causing more pain. On September 10, 2014, Dr. Young noted that ultrasound findings showed a very large incisional hernia in the left lower abdomen and a significant sized right inguinal hernia. Dr. Young recommended repair of the incisional hernia with mesh. This surgery was performed by Dr. Young on October 30, 2014. The doctor scheduled the Plaintiff to return to work on November 30, 2014, but later re-scheduled the return date to December 11, 2014. (R:993-1001)

On November 26, 2014, the Plaintiff returned to Dr. Jarolem, reporting that following his hernia surgery he was experiencing increased low back pain with episodes of weakness in his left leg. Dr. Jarolem noted that the Plaintiff was ambulating slowly with a cane. The doctor determined that the Plaintiff should not work for the next 4 weeks. On December 19, 2014, the Plaintiff advised Dr. Jarolem that he had begun physical therapy. The Plaintiff again was ambulating slowly with a cane. Dr. Jarolem continued the Plaintiff on no work status. (R:1055-58)

On April 8, 2015, the Plaintiff returned to Dr. Young, complaining of pain and a bulge to the left side of the previous hernia repair in the left lower abdomen. Examination revealed a recurrent hernia on the lateral side of the repair. Dr. Young stated that it felt as if the mesh had pulled away from its lateral sutures. The doctor recommended an intraperitoneal repair with a barrier mesh. He noted that the Plaintiff was unable to work as the result of the pain. Dr. Young performed the repair on June 2, 2015. (R:991-92, 1004-5)

On August 14, 2015, the Plaintiff returned to Dr. Jarolem for follow-up. The Plaintiff reported that he had experienced complications after his revision hernia surgery. He had developed bowel obstruction which required a colonoscopy for decompression, and had problems with wound healing. The Plaintiff continued to complain of lower back pain with some radiation into the left leg. Dr. Jarolem observed that when compared to earlier photographs, the Plaintiff's incision was much improved, although not completely healed. The Plaintiff ambulated slowly and had diffuse tenderness across the lumbosacral junction, but no motor deficits. The doctor determined that the Plaintiff was at maximum medical improvement for Worker's Compensation purposes. The impairment rating for his multiple lumbar surgeries, including a 3 level anterior fusion, and complications, which included multiple surgeries for abdominal hernias and colonoscopies, was 22%. (R:1048-49)

On October 15, 2015, the Plaintiff presented to Brad Herskowitz, M.D., a neurologist, complaining of low back pain, which was left-sided, radiating to the left leg and knee. The Plaintiff stated that his left leg got weak if he stood or sat for too long. The pain worsened with bending over, and the Plaintiff was unable to get on the floor to play with his grandson. Dr. Herskowiz' neurological examination yielded normal results. The doctor diagnosed lumbosacral root lesions, not otherwise

classified and left-sided low back pain with left-sided sciatica, noting that the Plaintiff was not able to sit or stand for short times and was totally disabled from his back pain. The doctor prescribed Lyrica. (R:1070-71)

On December 11, 2015, the Plaintiff presented to the emergency department at Westside Regional Medical Center in Miramar, Florida, complaining of lower abdominal quadrant pain. A CT scan of the Plaintiff's abdomen showed inflammatory process of the left pelvic sidewall with a 1.6 cm. round lesion, and possible left-sided obstructive uropathy. The Plaintiff was admitted to the hospital for work up and evaluation. The surgical consultant recommended either surgery for possible mesh infection or long-term IV antibiotics. The Plaintiff opted for the latter. Upon discharge, the Plaintiff was to follow up with urology and surgery. On December 23, 2015, the Plaintiff returned to Dr. Young, who diagnosed post-operative fever and abdominal pain. The doctor did not believe that there was a mesh infection and recommended that the Plaintiff continue with IV antibiotics. (R: 1103, 1128-29)

On December 26, 2015, the Plaintiff returned to the Westside emergency department with continued abdominal pain, and he again was admitted. Examining physicians determined that the Plaintiff possibly was suffering from a mesh infection and would need surgery to repair the mesh. The repair was performed at Westside by Rafael Sierra, M.D. on January 4, 2016. The Plaintiff continued treatment with Dr. Sierra for abdominal issues during 2016 and 2017. (R:1222-36, 1243-55)

On January 21, 2016, the Plaintiff presented to Dr. Jarolem, reporting continued low back pain and back spasm with pain into the bilateral legs and feet. The incision from the Plaintiff's third hernia surgery was healing well. Physical examination revealed diffuse tenderness in the lumbar region, while neurological examination was nonfocal and there were no motor deficits. Dr. Jarolem prescribed

Vicodin and Flexeril. The Plaintiff had regular follow-up visits with Dr. Jarolem throughout 2016 and 2017. On January 13, 2017, Dr. Jarolem noted mild paraspinal lumbar tenderness, mild paraspinal spasm, and positive straight leg raising bilaterally. Neurological examination was nonfocal and the Plaintiff had good coordination and walked with a normal gait. (R:1202-13, 1299-1300)

On November 1, 2017, Dr. Jarolem completed a Lumbar Spine Residual Functional Capacity Questionnaire as to the Plaintiff. The doctor stated that he had treated the Plaintiff on a regular basis since the Plaintiff's spinal surgery on January 7, 2014. According to Dr. Jarolem, the Plaintiff's symptoms included lumbar and radicular pain, as well as abdominal pain from hernias, as supported by X-ray and MRI imaging. Objective signs included the Plaintiff's 3-level lumbar fusion surgery; straight leg raising of 40 degrees on the left and 50 degrees on the right; swelling; muscle spasm; abnormal gait; sensory loss; reflex changes; tenderness, and crepitus. Dr. Jarolem did not find the Plaintiff to be a malingerer, and did not believe that emotional factors contributed to the severity of the Plaintiff's symptoms. Moreover, the Plaintiff's symptoms would interfere with the Plaintiff's attention and concentration on a constant basis. Dr. Jarolem listed the side effects of the Plaintiff's medications as sedation, confusion and constipation. He stated that the Plaintiff's impairments had lasted and/or could be expected to last at least 12 months, and his prognosis was poor. (R:1263-64)

Dr. Jarolem opined that the Plaintiff could walk for less than a city block without rest; could sit for 30 minutes and stand for 15 minutes at one time; could sit or stand/walk for less than 2 hours during an 8-hour workday. The Plaintiff needed to walk around for 1-2 minutes every 15 minutes in a workday. He required a job which would permit shifting positions at will from sitting, standing and walking. Also,

the Plaintiff would need to take unscheduled 15-minute breaks 8 to 10 times per workday. Dr. Jarolem stated that the symptoms he described in the questionnaire began in June 2013. (R:1265-66)

At the first administrative hearing on November 6, 2017, the Plaintiff testified that following his 1998 back injury a laminectomy was performed to address disc problems. After 6 months of rehab the Plaintiff was able to return to full duty work. His doctors were selected by Workers' Compensation. The Plaintiff continued to work full time until he was re-injured in 2013. Again his doctors were selected by Workers' Compensation. The second injury also required surgery, this time a 3-level lumbar fusion. After some post-operative complications the Plaintiff returned to light duty. At that time, the Plaintiff was 6' tall and weighed 235-240 pounds. At the time of the hearing, his weight was about 296 pounds. (R:98-100)

Subsequently the Plaintiff developed an additional post-surgery complication in the form of an incisional hernia on the left side of his abdomen. The first time the hernia was surgically repaired the mesh which was put inside him failed. This required a second surgery where a 10" by 15" mesh, running from hip to hip, was put in. After this, the Plaintiff developed an infection from the mesh, which required him to spend a month in the hospital while the infection cleared and a third surgery was performed. This last surgery took place in 2015. (R:100)

The Plaintiff continued to experience severe pain and swelling on the left side of his abdomen. His most recent hospitalization was in 2017 prior to the hearing. The Plaintiff explained that the weakening in his abdomen affected his back, since the abdomen controls the core and the core controls the back. The Plaintiff stated that his back problems had improved prior to the development of the hernia and he was working light duty 6-7 hours per day. However, after the second hernia surgery, he

began having back pain again, with numbness and tingling in his legs. The pain, and the medication prescribed to address it, continued to increase after that. After his hospital stay and third surgery in 2015, the Plaintiff required a cane to walk as the result of the severe pain and numbness which affected his balance. (R:101-02)

The Plaintiff testified that at that point Dr. Jarolem advised the Plaintiff that he could never return to his firefighting duties. The Plaintiff had been working light duty, but was unable to maintain that because he missed too much work with therapy appointments and the need to stay home some days because of the pain. He also was treated by a neurologist, Dr. Herskowitz, who agreed that the Plaintiff was permanently and totally disabled. The Plaintiff did not return to work after that. (R:103-04)

According to the Plaintiff, he still experienced low back pain, which on some days was a throbbing pain shooting into his legs that felt like an electrical shock. The Plaintiff was taking Vicodin, Flexeril and tramadol for the pain. He stated that Vicodin made him extremely drowsy, so he took it only on bad days or at night. The Plaintiff had to change positions frequently, used a massager in the shower and alternated applications of heat and ice. Some days he was able to move around, walking short distances with his wife and son, and other days he was unable to move at all. He generally had 2 to 4 bad days per week. The bad days generally occurred when he tried to do too much, such as riding on long car drives which required prolonged sitting or going to multiple medical appointments in a single day. The Plaintiff did not drive himself and the only household chores he was able to do were letting dogs in and out of the house and going to the corner store. (R:104-07)

Murray Goodman, M.D., a medical expert (ME) also testified at the November 2017 hearing. Dr. Goodman stated that the Plaintiff had physical

impairments of degenerative disc disease involving his lumbar spine; a spinal fusion operation in 2014; a repaired ventral hernia; chronic pain designated as a failed lumbar laminectomy, and a history of bronchitis and obesity.  The doctor opined that these impairments did not meet or equal a listing, but the Plaintiff would be limited to sedentary activity.  He could lift 10 pounds occasionally and less than 10 pounds frequently; could stand or walk for up to 2 hours in an 8-hour workday; could sit for 6 hours during a workday; had to avoid ladders and scaffolds, and could only occasionally bend, stoop crouch or crawl.  However, Dr. Goodman acknowledged that he would give great weight to the residual functional capacity assessment of Dr. Jarolem, the Plaintiff's treating physician. (R:90-93)

Lisa Goudy, a vocational expert (VE) was the third witness at the 2017 hearing.  The ALJ asked the VE to consider an individual of the same age, education and vocational background as the Plaintiff, who could perform sedentary work, with no exposure to heights and occasional postural limitations.  The VE testified that available jobs included telemarketer and telephone operator, both of which exist in significant numbers in the national economy.  However, if such a person could sit no more than 30 minutes at a time, stand for no more than 15 minutes at a time, and could sit or stand for less than 2 hours during an 8-hour workday, no jobs would be available.  Similarly, if the hypothetical individual needed to walk for 1 to 2 minutes every 15 minutes and take unscheduled breaks 8 to10 times per day, no jobs would be available.  (R:94-97)

On April 11, 2018, Dr. Jarolem observed that the Plaintiff ambulated slowly but otherwise with a normal gait. There were no motor of sensory deficits in the Plaintiff's lower extremities.  Straight leg raising produced low back pain bilaterally.

9

Lumbar X-rays showed a solid interbody fusion from L3-S1. Dr. Jarolem renewed the Plaintiff's prescriptions for Vicodin and Flexeril. (R:1292-93)

An MRI of the Plaintiff's cervical spine in July 2018 showed straightening of the normal cervical lordosis, possibly secondary to muscle spasm; an 8 mm central canal stenosis at C2-3, with mild left foraminal narrowing; an 8 mm central canal stenosis at C3-4, with moderate bilateral foraminal narrowing; a 7 mm central canal stenosis at C4-5, with moderate left and mild right foraminal narrowing; an 8 mm central canal stenosis at C5-6, with moderate-severe bilateral foraminal narrowing; moderate bilateral foraminal narrowing at C6-7; moderate left foraminal narrowing at C7-T1; multifocal uncovertebral and facet degenerative changes, and no evidence of cord signal abnormality. A cervical X-ray on January 8, 2018, showed cervicalgia and spinal stenosis in the cervical region. (R:1281, 1290)

On April 11, 2018, the Plaintiff presented to Dr. Sierra, the doctor who had performed his third hernia surgery, following a visit to the emergency room the preceding week for pain in his lower left abdomen. The Plaintiff reported that the acute pain had resolved and Dr. Sierra noted that a CT scan of the Plaintiff's abdomen was essentially normal. The doctor's examination of the Plaintiff's abdomen also yielded normal results. In a Workers' Compensation form completed on the same date, Dr. Sierra stated that there was a poor correlation between the Plaintiff's complaints and objective relevant physical findings, which indicated both somatic and non-somatic clinical factors. Recommended treatment was interdisciplinary rehabilitation and management. Dr. Sierra found that the Plaintiff had no functional limitations and no medication was prescribed. (R:1268-73)

On January 18, 2019, the Plaintiff returned to Dr. Jarolem for evaluation of intermittent neck pain and bilateral arm numbness, tingling and weakness. The

doctor's physical examination of the Plaintiff revealed no midline tenderness to palpation; minimal diffuse paraspinal cervical tenderness; no paraspinal spasm; no trapezius tenderness; mild restriction of forward flexion, extension, lateral bending and axial rotation to each side, and motor strength at 5/5 throughout. The Plaintiff walked with a normal gait. Dr. Jarolem noted abnormalities depicted in imaging of the Plaintiff's cervical spine. He diagnosed cervicalgia and spinal stenosis in the cervical region and recommended a course of physical therapy. (R:1282-83)

At the second administrative hearing on April 15, 2019, the Plaintiff testified that he was unable to work because of pain going through his legs and had begun to have problems with his shoulders. He had to change positions constantly and had days when he could not get out of bed. If he tried to walk long distances or sit for long periods of time, he would have to take medication which prevented him from any significant activity. The Plaintiff could only stand or sit for an hour or two and could lift about 10 pounds. (R:65-67)

The Plaintiff related that he had undergone three shoulder surgeries, two back surgeries and three abdominal surgeries. Before the third abdominal surgery in 2015, the Plaintiff had returned to work full time, and would return to his duties as a firefighter without hesitation if he were able. The Plaintiff continued to have good and bad days. He stated that medications he had used in the past had relieved his pain, but he had to increase the dosage of those medications over time. At the time of the hearing, the Plaintiff was using medical marijuana in sublingual and vape pen forms. When the pain became severe, the Plaintiff used the vape pen 1 to 3 times per day. (R:72-75)

The Plaintiff testified that toward the end of 2018 he began having neck problems which caused numbness in his hands every day. He also had to use the

11

restroom frequently. He took medication to reduce the number of restroom trips at night, but this increased the number of trips during the day. He also continued to have swelling at night at the site of his hernia surgeries. Additionally, the mesh inside him made it difficult to perform exercises to improve his back pain. The Plaintiff's weight at the time of the hearing was about 280 pounds. (R:75-79)

Joseph Gaeta, M.D. testified as an ME at the second hearing. Dr. Gaeta stated that the Plaintiff's primary severe impairments consisted of spinal issues in the lower back area and obesity. He believed that the Plaintiff's surgeries for incisional hernias were of lesser importance. None of the Plaintiff's impairments met or equaled a listing, and Dr. Gaeta opined that the Plaintiff could perform all levels of light work with some postural limitations: he could not climb ladders or scaffolds or crawl; could occasionally crouch, and could frequently stoop, kneel or bend. Additionally, the Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could sit or stand/walk intermittently for 6 hours during an 8-hour workday. The doctor did not believe that the Plaintiff had any environmental or postural limitations. (R:45-46)

Dr. Gaeta testified Dr. Jarolem's assessments, as expressed throughout his treatment notes and in his Medical Source Statement, were inconsistent with his physical examinations of the Plaintiff. In Dr. Gaeta's opinion, the only abnormal physical findings were positive straight leg raising. (R:48-50, 52-4) As to Dr. Young's assessment, Dr. Gaeta noted that they dealt with the Plaintiff's hernia and were time specific. Dr. Gaeta did not know whether Dr. Young's determination that the Plaintiff could not work referred to the Plaintiff's prior job or any work. To the extent that Dr. Young assessed that the Plaintiff's residual functional capacity was less than sedentary, Dr. Gaeta disagreed. Dr. Gaeta acknowledged that another of the Plaintiff's treating physicians, Dr. Sierra, found that the Plaintiff had no functional

12

limitations and that there was a poor correlation between the Plaintiff's complaints and the objective relative physical findings. (R:50-52, 60)

On cross examination by counsel for the Plaintiff, Dr. Gaeta conceded that positive leg raising indicates that a person feels pain, and that he had not taken into account the Plaintiff's pain in formulating his residual functional capacity. As a result, Dr. Gaeta had no way of determining the accuracy of Dr. Jarolem's assessment that the Plaintiff needed to take breaks every 15 minutes to deal with pain. Dr. Gaeta agreed with counsel that the treating physician is in the best position to make such an assessment. Dr. Gaeta also acknowledged that Dr. Sierra's assessment that the Plaintiff had no functional limitations referred to the Plaintiff's abdominal issues rather than his back pain. Additionally, Dr. Gaeta admitted that he had not taken into account the Plaintiff's frequent need to urinate, since the Plaintiff was receiving medication and the doctor did not believe that urinary bladder problems lead to permanent disability. (R:57-59, 62-64)

Heidi Feder, VE, was the final witness at the 2019 hearing. She testified that the Plaintiff's past relevant jobs as a firefighter and fire lieutenant were classified as very heavy work. The ALJ asked the VE to consider an individual of the same age, education and vocational background as the Plaintiff who had the residual functional capacity articulated by Dr. Gaeta. The VE testified that such a person could perform the jobs of cashier II and routing clerk, each of which exist in significant numbers in the national economy. However, if such a person could sit for no more than 2 hours and stand for no more than 2 hours during an 8-hour workday and could lift no more than 10 pounds, there would be no available jobs. The VE also testified that an individual who would be off task for 15% of the workday or would be absent 2 or more days per month would not be able to perform any work. Finally, if that person could

stand for only 15 minutes at a time, sit for 30 minutes at a time and would have to walk around for 1 to 2 minutes every 15 minutes, there would be no jobs he could perform. (R:81-83)

### III. DECISION OF THE ALJ

The ALJ began by finding that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2020, and had not engaged in substantial gainful activity since his amended alleged onset date of September 10, 2015. The Plaintiff had the severe impairments of lumbar disorder status-post fusion; obesity; hernia repairs, and recent cervical disorder. However, the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R:22-23)

The ALJ assessed that the Plaintiff retained the residual functional capacity to perform light work, except that he could never climb ladders, ropes or scaffolds; could never crawl; could occasionally crouch, and could frequently kneel, stoop and bend. After summarizing the April 2019 hearing testimony of the Plaintiff and the ME, the ALJ determined that although the Plaintiff's medically determinable impairments reasonably could be expected to cause his alleged symptoms, the Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R:23-25)

Next, the ALJ summarized the medical evidence pertaining to the Plaintiff's back and neck problems. (R:25-26) The ALJ concluded that overall, this evidence demonstrated that the Plaintiff had some limitations in gait and reproducible

pain after his 2 back surgeries, but did not demonstrate any limitations in range of motion or strength. Further, only conservative treatment was recommended for the Plaintiff's cervical pain and physical examination demonstrated only minimal symptoms. Based on the medical evidence and the testimony of the ME, the ALJ assessed that the Plaintiff was limited to light work with the listed postural limitations. (R:26)

After summarizing the evidence pertaining to the Plaintiff's hernia surgeries and subsequent treatment (R:26-27), the ALJ noted that the Plaintiff did not have any continuing issues with his hernia from January to October 2016, and had limited treatment in 2017. Thus, although the record demonstrated that the Plaintiff had some additional limitations because of his hernias, these limitations were taken into account by the ALJ in limiting the Plaintiff to light work. The ALJ stated that the effects of the Plaintiff's obesity had been incorporated into the ALJ's residual functional capacity assessment. (R:27)

The ALJ noted that the Plaintiff alleged that his impairments prevented him from working and testified that his pain sometimes was so severe that he could not get out of bed. The ALJ pointed out, however, that the Plaintiff at no time demonstrated any limitations in range of motion or strength. Additionally, the Plaintiff testified that medication helped relieve his pain and reported that he could use other conservative modalities for this purpose. Moreover, the Plaintiff never told any of his treating physicians that there were days when he could not move at all. The ALJ determined that these inconsistencies diminished the persuasiveness of the Plaintiff's allegations. Id.

The ALJ gave great weight to the opinion of Dr. Gaeta, who had reviewed the Plaintiff's entire medical history and his testimony at the 2019 hearing. The ALJ

noted that Dr. Gaeta determined that the restrictions imposed by Dr. Jarolem and Dr. Young were temporary because the Plaintiff was later returned to regular activities. Dr. Gaeta also found that there was a poor correlation between the Plaintiff's complaints and the objective findings. The ME assessed that the Plaintiff was limited to light work with the postural limitations incorporated by the ALJ in his residual functional capacity assessment. For the reasons cited by Dr. Gaeta, and the fact that by at least 2017 the Plaintiff could ambulate with a normal gait, the ALJ gave little weight to the functional assessments of total permanent disability by Dr. Jarolem and Dr. Young. The ALJ also gave little weight to Dr. Herskowitz' statement that the Plaintiff could stand or sit only for short times and was totally disabled from his back pain as it was inconsistent with the record. (R:27-28)

Based on the testimony of the VE at the 2019 hearing, the ALJ determined that the Plaintiff could not perform his past relevant work as a firefighter and fire lieutenant, but could perform the jobs of cashier II and routing clerk, jobs which exist in significant numbers in the national economy. Accordingly, the ALJ concluded that the Plaintiff was not disabled for purposes of the Social Security Act. (R:28-30)

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The Plaintiff seeks reversal or remand on the ground that the ALJ failed to accord proper weight to the medical opinions of the Plaintiff's treating physicians: Dr. Jarolem, Dr. Young and Dr. Herskowitz.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993) (citing Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987)).

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First, the claimant must not be engaged in substantial gainful activity after the date the disability began. Second, the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four. In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work. The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform

past relevant work, the burden shifts to the ALJ in step five. The ALJ must show that there is other gainful work in the national economy which the claimant can perform. Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to perform such work.

In the instant case, the Plaintiff argues that in formulating his residual functional capacity assessment, the ALJ failed to accord proper weight to the opinions of the Plaintiff's treating physicians: Dr. Jarolem, Dr. Young and Dr. Herskowitz. For claims filed prior to March 27, 2017, 20 C.F.R. § 404.1527(c)(2) provides that a treating source's medical opinion will be given controlling weight on the issues of the nature and severity of a claimant's impairment if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record." If the opinion of a treating source is not given controlling weight, the ALJ will consider other factors, such as supportability by medical signs and laboratory findings; consistency of the opinion with the record as a whole, and the source's area of specialization. 20 C.F.R. § 404.1527(c)(3)-(6).

The testimony of a treating physician must be given considerable weight unless "good cause" is shown to the contrary, and failure of the ALJ to clearly articulate the reasons for giving lesser weight to the opinion of a treating physician constitutes reversible error. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); 20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 404.1527(c)(2) (2017). This Circuit has held that the requisite "good cause" exists where the treating physician's opinion is not supported by the evidence, where the evidence supported a contrary finding, or where the

physician's opinion was conclusory or inconsistent with their own medical records. Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).

Here, the ALJ articulated his reasons for giving little weight to the opinions of the Plaintiff's treating physicians. The ALJ relied on the assessment of the ME, Dr. Gaeta, who found that the restrictions imposed by Dr. Jarolem and Dr. Young had been temporary because the Plaintiff was later returned to regular activities, and that there was a poor correlation between the Plaintiff's complaints and the objective findings. In according little weight to the opinions of Dr. Jarolem and Dr. Young, the ALJ also considered the fact that by at least 2017 the Plaintiff could ambulate with a normal gait. The ALJ gave little weight to Dr. Herskowitz' statements in his treatment notes that the Plaintiff could stand or sit only for short times and was totally disabled from his back pain, finding those statements to be inconsistent with the record as a whole. Additionally, the ALJ pointed out that the Plaintiff at no time demonstrated any limitations in range of motion or strength; that the Plaintiff testified that medication helped relieve his pain and reported that he could use other conservative modalities for this purpose, and the Plaintiff never told any of his treating physicians that there were days when he could not move at all.

It is clear from the record that the Plaintiff would have returned to his job as a firefighter were he able to do so. However, the issue before the ALJ and this Court is whether the Plaintiff retained the capacity to perform other jobs existing in significant numbers in the national economy. The undersigned concludes that the ALJ's decision to accord little weight to the opinions of Dr. Jarolem, Dr. Young and Dr. Herskowitz was based on his properly articulated determination that those opinions were not supported by the medical evidence. Therefore, the ALJ's determination that

the Plaintiff was not disabled for purposes of the Social Security Act should not be disturbed.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Amended Motion for Summary Judgment (ECF No. 25) be DENIED, and Defendant's Motion for Summary Judgment (ECF No. 21) be GRANTED.  The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas , United States District Judge.  Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in this Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice.  See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 14th day of June, 2021.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:
All Counsel of Record